My client, Nan San Myint, is a native and citizen of Burma. She's ethnic Karen. She resided in the Karen State of Burma all of her life. The Burmese Army and the Karens have engaged in a civil war since the independence of Burma in 1948. Things to remember, and two important things I think, are that this is first of all a pre-real ID case acknowledged by the Board. Second is that the documented things proven by the State Department and other documents that we submitted indicate that the Karens were treated horribly by the Burmese Army, giving rise to a belief that what she testified to was very reasonable in conformity with country conditions at the time. Instead of dealing with Ms. Myint's claim of persecution, the judge denied the case based upon her alleged failure to prove her identity. The judge relied on two things to reach that conclusion, in spite of documents that the respondent did submit to prove her identity. First of all, she submitted her certified copy of her original Burmese birth certificate with a translation. She second submitted her children's birth certificate, listing her as the mother and listing her husband by his name. Third, she submitted a marriage certificate of her second husband in Thailand in 1993, where she listed her true name of Nan San Myint, her correct birthday, her Karen nationality, her Burmese citizenship, the fact that she was a Christian, and her occupation as a housemaid. The judge did not comment on that. Instead, she focused on the fake passport. Ms. Myint testified that she had purchased the passport from a broker in Thailand, that she needed it to work, much like one would need a green card real estate to work in the United States. It's a common practice. The State Department reports, for Burma at least, indicate that it's rampant that passports can be purchased. Second, on the passport itself, even though it had her photograph, which she explained that she gave them her photograph, it had incorrect physical descriptions. It identified a mole on her right cheek and declared that her eyes were black, where in fact they were brown. Ms. Myint pointed that out to the judge. She was sitting right in front of the judge looking at her. The judge told her not to pay any attention to that. The judge considered traveling with the fake passport to be relevant for some reason. I don't know that it is. If you've got a good fake passport, why wouldn't you be able to travel? She traveled with her State Department employee to many different countries. What's relevant here is there's no evidence from the time she got the passport that she ever traveled back to Burma. She has children in Burma, relatives in Burma. Why wouldn't she go back to Burma? Of course, unless she were afraid to. If she were afraid to go back, why would she need to identify a fake name to make her claim, rather than her true name that she proved? Now, the judge and the board seemed to think that the fact that she was working for a State Department employee would have subjected she and her passport to some sort of a security check. And there's nothing in the record that indicates that employees of State Department employees have to go through any type of a security check whatsoever. She wasn't working for the State Department. She was basically cleaning toilets and making beds. And there's nothing but pure speculation on the part of the judge that she would have to go through any type of check. The other document that the judge based her finding on was the husband's death certificate. First of all, it wasn't the official Burmese death certificate translated into English. It was the translation itself. The original death certificate was never submitted. Second, there's no evidence that Ms. Mint supplied the information that applied for the death certificate itself. That was never her testimony. So the incorrect information or the conflicting information on the birth certificate, there's no indication that that information was true, or even if it was true, that she submitted it. Bear in mind that this occurred in 1992, and she was testifying 14 years later in 2006. She gave reasonable explanations as to some of the inconsistencies. The death certificate did not contain the husband's birth date, only his age. It listed him as being a teacher. She said he was a teacher earlier in his life, and he became a merchant. But I think the most important thing is the death certificate of the husband has nothing to do with her identity. Her name is never listed on that certificate. It in no way proves or disproves or has anything to do with her identity. It is an irrelevant minor inconsistency. And that then leads us to the concern as to what standard of proof or what burden of proof was the judge and the board using. The board made, I think, an incredible statement where it said, well, the, I'm paraphrasing, well, the minor inconsistencies would not affect her claim for persecution pre-real ID. It somehow did affect her claim as to who her identity was. Now, I know of nothing in the law that says there is a different burden of proof pre-real ID between a person's claim for persecution or their claim as to who their identity is. It's the same burden of proof. So if there were minor inconsistencies, why would that give rise to a belief that she hadn't proved who she was? She testified practically without inconsistency as to the entire life story, her claims for persecution, her dates and times in prison, the locations, the names, with great detail. She testified as to why she left. She testified as to how she got the passport and why she got the passport and why she would go to Laos every three months to review her parole visa by going to the Burmese, excuse me, the Thai consulate there. There is no reason at all in the judge's findings of the passport and the death certificate simply do not give rise to a belief that she is not who she says she is. Do you want to save the rest of your time for rebuttal? Yes, Your Honor. Thank you. Good morning, Your Honors. May it please the Court. Excuse me. Jem Sponza on behalf of the government. The record before this Court simply does not compel reversal of the agency's determination Petitioner failed to prove her identity and therefore failed to prove her eligibility for asylum and related relief. Identity is so crucial in this case because what Petitioner did demonstrate through her evidence and testimony is that she is capable of choosing which persona works best at different times in her life. Well, what's your incentive for adopting Myint if it isn't her name? The story that is attached there, too. We don't know anything about Ms. Liang other than that the record contains a passport with multiple visas issued by various governments, including our own, including that of the United States, that Ms. Liang worked for a State Department official for a long time, and that once the visa issued to that individual had expired, all of a sudden our Petitioner comes forward as Ms. Myint. That's the problem. There are two discrete sets of identity evidence in this record, one that's riddled with inconsistencies, another that accrues from a passport used to obtain employment with a State Department official and used to travel. The issue is on this record, on Petitioner's testimony, and in the absence of any argument that the record compels the conclusion she is Ms. Myint, we simply do not know which to believe. The immigration judge, as affirmed by the Board, properly weighed those sets of identity documents and evidence and found that her testimony she was Ms. Myint was simply not persuasive. It did not outweigh the evidence of record supporting the reading that she is Ms. Liang, who worked for Mr. Pendergrass and traveled widely. Admittedly, the fact Petitioner obtained what she now calls a fraudulent passport could not per se defeat her applications for relief, and that isn't what we have here. Instead, the agency accepted her two accounts, who she might be, again weighed those documents and concluded she had not credibly established that she was Ms. Myint. The inconsistencies in her testimony regarding when her husband, when her first husband died, what his employment was, those are material, and they do go to the heart of her claim, because her initial burden, her first ---- Well, of course, the Board said they might not go to the heart of the asylum claim. They seem to think they went to the heart of her identity claim. We would read that slightly differently. The only issue the Board reached, the only issue before this Court, is whether Petitioner proved her identity. That's an alien's initial burden, her first exercise, and as this Court has recognized in both Coloma and Farah, identity is key and foundational. Now, about the husband, what's the problem? The date of the death? Yes, Your Honor. And in fact ---- All right. So she testifed the declaration said that he was released in August 1992. Correct. And he died in January 1992. Now, obviously, that's got to be some kind of a mistake. I mean, if she testified that he was alive and released in August, she couldn't have deliberately been saying he died in January. The problem, Your Honor, is that, in fact, Petitioner's testimony in immigration court and the translation of the death certificate, those documents are consistent. The same date is offered in each. What is inconsistent is Petitioner's written statement in support of her asylum application. When confronted with that ---- But that was not ---- was that referenced at all by the IJ or the BIA in its list of reasons why it didn't believe her? It was, Your Honor. Both the immigration judge and the board noted the inconsistencies in the testimony and evidence regarding the date of Petitioner's first husband's death. But they did not reference her asylum statement? I believe ---- I would suggest, Your Honor, and my reading of the record has been that that statement in support of the asylum application is evidence and testimony. But don't we have to look at the reasons cited by the IJ? Well, we're reviewing the BIA decision. Yes. Don't we have to look at the reasons cited by the BIA? Absolutely. And I believe Petitioner's asylum application as an exhibit is cited by the BIA at page 3 of the record in support of its determination that those inconsistencies are fatal to her claim. Moreover, when confronted, I believe by the DHS trial attorney, with those ---- the inconsistency between the death certificate and her written statement in support of her asylum application, Petitioner sought to disavow and distance herself from the death certificate, which would have been consistent with her testimony and not that sworn statement. That's problematic and not what you would typically see in these kinds of cases where an inconsistency is noted for the alien. They're given an opportunity to address it. It's ---- What regulation or statute makes identity the central or threshold issue to an asylum claim? It's an element of proving status as a refugee. This all ---- this whole exercise begins from, pardon me, 1158B1, large B, small I, and small II of the code, the Immigration and Nationality Act. It's the first step. It says what is the ---- what does that section say? I believe this Court's analysis and the government's interpretation here, it's that in proving you are a refugee, in proving that first piece, to then proceed to whether your experiences rose to the level of past persecution, whether you have a fear of future persecution, is establishing that you are a refugee as this ---- And you could imagine a refugee in certain conditions in the world where you can prove that you're a refugee and you can prove you've been terribly mistreated, but you may not be able to prove who you are. Absolutely. And that's why this Court has recognized and the government doesn't dispute that simply testifying to acquisition of a fraudulent document or simply appearing and not having, you know, an ideal set of identity documents is never, per se, a bar to an application for relief. But credible, consistent testimony is required. And that is what we do not have here. I still am not clear. Could you explain to me exactly what the inconsistency is about the date of death? Certainly, Your Honor. Petitioner's testimony in immigration court was that her husband was released in August of 1992. That's at page 111 of the record. And died in November of 1992. That's at page 116. Yes. When confronted with the death certificate, that's at 467 of the record. And, again, I believe this is by the DHS trial attorney in her hearing.  And her supporting statement, which is at 522, petitioner's testimony, was that she thought the death certificate was a mistake, despite her testimony consistent with the date set forth therein. And that's at 149. Yeah. That exchange between Petitioner and the trial attorney. So the death certificate has the same date to which Petitioner testified, November  Yeah. And even when confronted with the death certificate. Well, what's the problem? I mean, she testified consistently with the death certificate. Now, where's the inconsistency? The inconsistency. In the declaration? Correct. Between her sworn statement and the death certificate. Those two. And in her declaration, she said he was released in August of 1992. I believe so, Your Honor. And then he died in January of 1992. Now, that's obviously a mistake. It could be. But when offered an opportunity. Well, what else could it be to say he was released in August and he died in January? When offered an opportunity to say that the mistake is in her sworn statement, instead Petitioner said the mistake was in the death certificate. That's a problem. That's an opportunity to clarify an inconsistency. But she did testify that he died in November on a date the death certificate says. That was her initial testimony. But when on cross-examination confronted with this inconsistency between her documentary submissions generally and her testimony, Petitioner disavowed the death certificate. That's the issue. She was obviously confused about the date because in her declaration, that was obviously an error. And she got the right date on when he was released. On the wrong date on when he died, it could not have been when she said. Now, there's no possible benefit to her. There isn't. But the alien's exercise, the burden, is to prove through credible and consistent testimony. Here, as I said at the outset, we simply have two sets of identity documents, two discrete sets. I don't understand. You're going to have to help me on this one because I don't understand what the husband's death certificate, his age when he died, or the stuff about his profession had to do with even her identity. I just don't see how that is relevant to showing who she is. I mean, her story seems pretty consistent and plausible that she escaped and took on a new identity so she could work in Burma. Not in Burma, but where did she go to? I believe Thailand. Thailand, to work in Thailand. And to work in Thailand, she had to get this passport. And so she took a different name because otherwise she could be discovered by the Burmese. I think she took the separate identity simply because her story is it's common practice to buy those passports in Thailand. What does all that have to do? Three of the four inconsistencies that the BIA says are minor but nonetheless relate to her identity have only to do with her husband, her first husband. So how does that even go to her identity? They undermine her claim that Ms. Mint actually exists and is who she now claims to be. There's a record of her birth. There's a record of her marriage. She's married under the name of Mint. I don't understand how mistakes in the husband's death certificate have to do with that when you have all these other documents in the record. Because her misstatements, the inconsistencies regarding her time as Ms. Mint, they are equally to be weighed against the submitted and admitted marriage certificate, against the birth certificates of her children. All of that was accepted by the immigration judge, considered, and weighed and cumulatively set against the evidence of record regarding her time as Ms. Lange. Those inconsistencies in tracking through the evidence and stories she offered of her time as Ms. Mint on this record, they go to whether that's a consistent and cohesive account of her actually being that person. That's the problem. And there was no error for the immigration judge, as affirmed by the board, to say, again, two sets of evidence, one as Ms. Lange, no inconsistencies, multiple visas issued to her, including by our government. Obviously, she was using that name when she didn't want to get sent back to Burma. So she had to adopt a different name. If she's going to get a work permit, be approved by our wonderful State Department, which the IJ thinks makes no mistakes and conducts investigations that contain no erroneous information, although there's no evidence to that effect in the record. These mistakes are clearly explicable. Her first statement about that he died before he was released obviously makes no sense. And then she's held not to be who she is because you can't understand why she made that mistake. Then when she's confronted with it at the hearing and asked about those dates, she also gave an answer that couldn't be possibly true. So it makes more sense that it doesn't show she's somebody else. But how old is her husband? She testified that he was 35 at the time of his death. The death certificate says 39. She says she thought 35 because they were classmates, so she thought he was her age. How does the death certificate identify his true age? How do we know that that's correct? I want to apologize. My time has severely run, and I did not know this earlier. Oh, that's all right. Don't worry. Thank you, Your Honor, if I may. Before you send somebody back out of the country to be tortured, you know, it's worth taking the time to explain what seems to be a rather inexplicable decision. How do you know that the death certificate is accurate as to the age? There isn't any direct determination that it is. The problem is Petitioner's testimony as it relates to that death certificate. Yeah. Her testimony was that that's what she thought his age was. Correct. Because they graduated from high school together. Maybe she was wrong and he was a somewhat slow student and got into the grade at an older age. That could have been. But how do we know that the death certificate is accurate age? Who gave them the age? Her response was to disavow that death certificate, Your Honor. That was her. Right. And how do we know the death certificate had his correct age? We don't. We know it was submitted by Petitioner. Yeah. We know it was offered by her, not by the government. She offered it to prove her claim. And instead, it undermined it. I would just note in response to an earlier part of Your Honor's question, Petitioner had many opportunities to assert this claim for asylum and protection prior to the expiration of her visa to come to the United States. She arrived first in her refugee camp in Thailand, at that time elected on her testimony now to purchase this fraudulent document and work for years instead of asserting this claim at that time. All of these elements were considered and weighed by the agency. It's a unique case. There are a lot of factors here and a lot of elements that are very different from other situations in which we see identity as an issue, where we see an individual disavowing a fraudulent document. Here, we have the acquisition of a fraudulent document, employee for a significant period of time, and only on the expiration of a visa asserted or issued by the United States, this claim that she's this other person who had these different experiences and an effort to successfully pursue asylum and withholding on that other identity. Suppose she had just used the name that she had on the passport and said that I'm whatever it is, I'm, I don't remember the name that was on the passport. Suppose she'd said I'm that instead of I'm this, me, and told the same story. What difference would it have made? Well, perhaps we would have had birth certificates and the same marriage license to a woman by a different name. That's what you never know in these cases. But where we have such distinct. I mean, what is your theory that she's not really Ms. Mint? She's the one on the passport? The theory is simply that we know she has proffered herself as two different individuals, and we do not know which to believe. Well, wouldn't it have been simpler for her just to proffer herself as the person on the passport and show that she has, that's why, that's what proves what she is, and she's been a wonderful citizen of whatever, and she's worked for the United States State Department for all these years, and now she wants to have asylum because she can't go back to Burma. And what does it add to her to tell this story that she's really somebody else? Wouldn't she have been better off just saying she was the lady whose name is on the passport? That's her speculation before this Court. She offers that argument as a reason why the record should be read as supporting proof of her identity, proof that she did establish her identity. But that's speculative. That isn't citation to evidence compelling reversal. I'm just trying to understand rationally, logically, why would this happen? Why would she ever make this up when she didn't need to? We don't know, Your Honor. Another way to look at it is perhaps Ms. Lange truly only exists as far as that first fraudulent passport. And if she had come and said, look, I've been working for the State Department for all these years, here's my passport, nobody would have said there wouldn't have been any reason to doubt her identity, would they? We don't know, Your Honor. It would be a different matter. I suppose you probably could have found a way to doubt her identity. But, I mean, it's just a story that doesn't make any sense. We would agree. And in the absence of an argument compelling aversion other than that result, other than that reached by the agency that does make sense, the petition for review must be denied. I would think maybe the agency would want to think about this a little more before they really wanted to deport this lady. But I'm sometimes surprised, frequently surprised. Okay. Well, you did a good job. Many thanks to the additional minutes, Your Honor. I apologize for not noting it. Thank you. Thank you. Counsel noted that she did not make her application for asylum until she got to the United States and her visa ran out. I'm just wondering where should she have made her application for asylum. Perhaps she could have made it in Vietnam or Jamaica or she could have made it in Thailand where they don't grant asylum where 600,000 refugees are living in MESOC-funded Thai Burma border. I, too, if I understand the theory of the government's case is that, as you've noted, she came here under the name of, her true and correct name of Nhi Lang and got here and decided she would make up a totally false person, have documents to prove she was a totally false person and get some sort of a benefit out of that. It just doesn't make any sense how the IJ could arrive at this conclusion. Those of us who practice immigration law before IJs sometimes find IJs that simply don't want to grant a case. And that's my explanation. Thank you. Thank you. The case is submitted.
judges: Canby, Reinhardt, Wardlaw